IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION, UTAH<br><br>        Plaintiff,<br><br>v.<br><br>STATE OF UTAH, et al.,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>No. 2:75-cv-00408-RJS<br><br>District Judge Robert J. Shelby |

By 1997, the Tenth Circuit had resolved "all boundary questions" between the Ute Indian Tribe of the Uintah and Ouray Reservation (Tribe), the state of Utah and its subdivisions (collectively, the State).[1]  Nevertheless, pending before the court is another boundary issue between the Tribe and the State: "whether the surface of 'split estate lands' are 'Indian Country' or 'non-Indian Country' for purposes of determining criminal and civil jurisdiction over matters occurring on the surface of the split estate lands."[2]  Split estate lands are lands where (1) the Tribe "holds a sub-surface mineral estate interest," and (2) "the surface estate of the lands have all three of the following characteristics: (i) were 'unallotted;' (ii) were 'opened to non-Indian settlement under the 1902–1905 legislation;' and (iii) were not thereafter 'returned to tribal

---

[1] *Ute Indian Tribe of the Uintah v. Myton* (*Ute VII*), 835 F.3d 1255, 1264 (10th Cir. 2016).  The court adopts the naming conventions used by the parties to refer to the prior *Ute* decisions: *Ute Indian Tribe v. Utah* (*Ute I*), 521 F. Supp. 1072 (D. Utah 1981); *Ute Indian Tribe v. Utah* (*Ute II*), 716 F.2d 1298 (10th Cir. 1983); *Ute Indian Tribe v. Utah* (*Ute III*), 773 F.2d 1087 (10th Cir. 1985) (en banc); *Ute Indian Tribe v. Utah* (*Ute IV*), 935 F. Supp. 1473 (D. Utah 1996); *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah* (*Ute V*), 114 F.3d 1513 (10th Cir. 1997); *Ute Indian Tribe v. Utah* (*Ute VI*), 790 F.3d 1000 (10th Cir. 2015); and *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Myton* (*Ute VII*), 835 F.3d 1255 (10th Cir. 2016).

[2] Dkt. 1304, *Joint Motion to Reopen Case and for Status Conference* (*Joint Motion to Reopen*) at 2.

1

ownership.'"[3]  For the reasons explained below, the court concludes the surface of split estate lands is not Indian Country.

## FACTUAL BACKGROUND[4]

The Uintah Reservation was created by Executive Order in 1861 and confirmed by an act of Congress in 1864.[5]  In 1887, Congress passed the General Allotment Act authorizing the President to "allot portions of reservation land to tribal members and, with tribal consent, to sell the surplus lands to [non-Indian] settlors."[6]  In 1902, pursuant to the General Allotment Act, Congress passed an Act allotting Uintah Reservation land to tribal members and restoring all unallotted lands "to the public domain" after October 1, 1903, provided that a majority of the adult male Tribe members consented (1902 legislation).[7]  The government failed to obtain consent from a majority of the Tribe.[8]  In 1905, Congress passed additional legislation that incorporated much of the 1902 legislation but no longer required tribal consent and provided unallotted lands "shall be disposed of under the general provisions of the homestead and town-site laws" (1905 legislation).[9]  After passage of the 1902 legislation and 1905 legislation (collectively, 1902–05 legislation), unallotted land was opened for non-Indian settlement.  By 1945, large portions of the reservation remained unclaimed, despite being open for resettlement

---

[3] *Id.* at 2 n.1 (quoting *Ute V*, 114 F.3d at 1528).

[4] The parties agree there are no material factual disputes between them, and the court should resolve the split estate issue as a matter of law.  *Joint Motion to Reopen*; *see also* Dkt. 1326, *Joint Request for Ruling Regarding Jurisdiction of "Split Estate" Lands Prior to Stipulated Resolution of the Consolidate [sic] Claims and Entry of Consent Decree and Permanent Injunction* (*State Br.*) at 5; Dkt. 1317, *Brief on Split Estates* (*Tribe Br.*) at 6.  The court briefly summarizes the facts here as found in prior decisions.

[5] *Hagen v. Utah*, 510 U.S. 399, 402 (1994).

[6] *Id.* (quoting *DeCoteau v. Dist. Cnty. Court for Tenth Jud. Dist.*, 420 U.S. 425, 432 (1975)).

[7] *Id.* at 403–04; *see also Ute III*, 773 F.3d at 1089.

[8] *Ute I*, 521 F. Supp. at 1118 ("Indian consent to the opening of the Uintah Reservation was wholly lacking in 1903, and never subsequently appeared.").

[9] *Hagen*, 510 U.S. at 406–07.

for four decades.[10]  That year, the Secretary of the Interior issued an order restoring the

unallotted land to tribal ownership (1945 Restoration Order).[11]  The 1945 Restoration Order

returned about 217,000 acres and the mineral estates underlying fee-patented lands to tribal

jurisdiction.[12]

## PROCEDURAL HISTORY

This litigation has been ongoing for 51 years.  The court briefly summarizes the

procedural history here.[13]

The case was originally filed in 1975.[14]  Four years later, the Honorable Bruce S. Jenkins

presided over a two-day bench trial.[15]  In 1981, Judge Jenkins issued *Ute I*.[16]  In 1985, in *Ute III*,

the Tenth Circuit affirmed en banc the relevant holding of *Ute I*: the 1902–05 legislation did not

diminish the Uintah Reservation and all land within the Reservation's outer boundary is Indian

Country.[17]

In the late 1980s, the Utah Supreme Court issued several rulings that directly contradicted

*Ute III*.[18]  The U.S. Supreme Court granted certiorari in *Hagen v. Utah* to resolve the conflict,

and, in 1994, held the 1902–05 legislation diminished the Uintah Reservation.[19]  The Court

affirmed Utah's exercise of criminal jurisdiction over acts occurring on land within the original

---

[10] *Ute VII*, 835 F.3d at 1258.

[11] *Id.*

[12] *Id.*; *Ute I*, 521 F. Supp. at 1142–44.

[13] For more robust summaries, see *Ute V*, 114 F.3d at 1516–20, and *Ute VII*, 835 F.3d at 1258–60.

[14] *Ute I*, 521 F. Supp. at 1075 ("The Ute Indian Tribe filed a complaint with this Court on October 15, 1975 . . . .").

[15] *Id.* at 1080.

[16] *Id.*

[17] *Ute III*, 773 F.2d at 1088–89.

[18] *Ute V*, 114 F.3d at 1518.

[19] *Hagen*, 511 U.S. at 410–21.

reservation boundary that was unallotted and opened to settlement under the 1902–05 legislation.[20]

In 1997, the Tenth Circuit modified *Ute III* to the extent that it directly conflicted with *Hagen*.[21] The Circuit explained, "*Hagen*'s only effect was to reduce (and not terminate) the boundaries of the Uintah Valley Reservation to the extent that lands within the Reservation were unallotted, opened for resettlement under the 1902–05 legislation, and not thereafter returned to tribal ownership."[22] *Ute III*, which "disposed of all boundary questions at issue on the merits," otherwise remained in effect.[23] Accordingly, the Circuit held Indian Country includes (1) all trust land and (2) all non-trust lands that were (a) "apportioned to the Mixed Blood Utes under the Ute Partition Act," (b) "allotted to individual Indians that have passed into fee status after 1905," or (c) "held in trust after the Reservation was opened in 1905 but have since been exchanged into fee status by the Tribe for then-fee (now trust) lands."[24] Indian Country does not include "non-trust lands . . . that passed from trust to fee status pursuant to non-Indian settlement under the 1902–05 allotment legislation."[25] This holding created "checkerboard jurisdiction" within the original Reservation boundary, "where state and local officials bear criminal enforcement power on some lands and federal and tribal officials oversee others."[26]

---

[20] *Ute V*, 114 F.3d at 1519 (summarizing *Hagen*).

[21] *Id.* at 1527.

[22] *Id.* at 1528.

[23] *Id.* at 1521, 1528.

[24] *Id.* at 1529–30.

[25] *Id.* at 1529.

[26] *Ute VII*, 835 F.3d at 1262 ("[C]heckerboard jurisdiction is a fact of daily life throughout the West.").

4

Nonetheless, the litigation continued.  The case reached the Circuit on two additional occasions: *Ute VI* and *Ute VII*.[27]  In the latter, the Tenth Circuit again emphasized no boundary issues remain:

> Thirty years ago, [in *Ute III*], this court decided all boundary disputes between the Ute Indian Tribe, the State of Utah, and its subdivisions. . . .  Twenty years ago, [in *Ute V*], we modified our mandate in one respect, but stressed that in all others our decision of a decade earlier remained in place.[28]

The Circuit further instructed, "Between *Ute III* and [*Ute V*], all boundary questions at issue had been finally resolved."[29]

After *Ute VII* was remanded, the case was assigned to the undersigned and shortly thereafter stayed while the parties pursued mediation.[30]  On September 16, 2025, the parties filed a joint motion to reopen the case and resolve the "sole remaining legal question"—the split estate issue.[31]  After the benefit of oral argument on February 12, 2026, the issue is ripe for review.[32]

---

[27] *See Ute VI*, 790 F.3d at 1000; *Ute VII*, 835 F.3d at 1255.

[28] *Ute VII*, 835 F.3d at 1257.  *Ute VI* also expressed frustration with the continued litigation, stating, "sooner or later every case must come to an end. . . .  For a legal system to meet this promise, of course, both sides must accept—or, if need be, they must be made to respect—the judgments it generates. . . .  [T]he time has come to respect the peace and repose promised by settled decisions.  In the event our hope proves misplaced and the defendants persist in failing to respect the rulings of *Ute V*, they may expect to meet with sanctions in the district court or in this one."  *Ute VI*, 790 F.3d at 1003, 1013 (citation modified).

[29] *Ute VII*, 835 F.3d at 1264.

[30] *See* Dkt. 1250, *Order of Recusal*; Dkt. 1268, *Order* (staying the case).

[31] *Joint Motion to Reopen*; Dkt. 1305, *Order Granting Joint Motion to Reopen Case*.  Defendants Myton City and Duchesne City filed a response to the Joint Motion to Reopen, identifying an additional legal issue that they are still resolving with the Tribe.  *See* Dkt. 1311, *Defendants Myton City's and Duchesne City's Response to Joint Motion to Reopen Case and for Status Conference*.  This issue is not before the court today.

[32] Dkt. 1330, *Minute Entry*; *Tribe Br.*; *State Br.*; Dkt. 1321, *Response/Reply Brief on Split Estate Issue* (*Tribe Reply*); Dkt. 1319, *Defendants' Response Memorandum Regarding Split Estates* (*State Reply*); Dkt. 1329, *Defendants' Sur-Reply Regarding Split Estate Lands* (*State Sur-Reply*).

## LEGAL STANDARD

The court construes the briefs as cross-motions for declaratory relief.[33]  Federal Rule of Civil Procedure 57 "govern[s] the procedure for obtaining a declaratory judgment under 28 U.S.C. § 2201."[34]  Section 2201 provides, "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration . . ."[35]  "Because of the Act's use of the word 'may,' the Supreme Court has held it confers upon courts the power, but not the duty, to hear claims for declaratory judgment."[36]  The Tenth Circuit has instructed,

> In determining whether to exercise their discretion, district courts should consider the following factors: [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race to *res judicata*; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.[37]

These factors strongly support exercising the court's discretion to issue declaratory relief here.  The original Complaint sought "declaratory . . . relief establishing the exterior boundaries of the Uintah . . . Reservation."[38]  Such relief will end a case that has lasted over 50 years.  As the parties have explained, "Resolution of [the split estate issue] is necessary to facilitate the

---

[33] The parties do not identify the governing Federal Rule of Civil Procedure. The State includes a standard of review section stating, "The jurisdictional status of Split Estate lands presents a question of law. . . . As there are no material facts in dispute regarding the nature of these lands or the prior judgments, the Court may resolve this matter as a matter of law." *State Br.* at 5.  The Tribe does not include a standards section. *See Tribe Br.*

[34] Fed. R. Civ. P. 57.

[35] 28 U.S.C. § 2201(a).

[36] *Mid-Continent Cas. Co. v. Village at Deer Creek Homeowners Ass'n, Inc.*, 685 F.3d 977, 980 (10th Cir. 2012) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286–87 (1995)).

[37] *Id.* at 980–81 (quoting *St. Farm Fire & Casualty Co. v. Mhoon,* 31 F.3d 979, 983 (10th Cir.1994)).

[38] *Ute I*, 521 F. Supp. at 1075.

approval and execution of a consent decree and stipulation to end this litigation."[39]  The need to clarify the legal relations at issue is especially strong in this case.  As Judge Jenkins explained in *Ute IV*, "people living in the area of the Uintah Reservation includes *both* Indian and non-Indian residents, whose interests, concerns, and expectations deserve thoughtful consideration and most of all, respect."[40]  Approximately 146,000 acres is split estate land at issue here.[41]  For fifty years, the residents have not known the jurisdictional status of their home.  Declaratory relief will resolve this uncertainty and provide necessary clarity for the federal, tribal, and local governments.  This relief will reduce the friction between these sovereigns and finally delineate jurisdiction after decades of uncertainty.  No other remedy is more effective.  All parties agree there are no disputed material facts and ask the court to resolve the split estate issue as a matter of law.[42]  Further, both parties seek declaratory relief, and there is no evidence of improper procedural maneuvering.  Accordingly, every factor weighs in favor of issuing declaratory relief.

## ANALYSIS

This order proceeds by (1) summarizing the law of the case doctrine, the mandate rule, and finding both apply here; (2) concluding the surface of split estate land is not Indian Country under *Ute V*; and (3) considering, and rejecting, the Tribe's argument that *Ute III* affirmed a specific holding in *Ute I* that split estate land is Indian Country.

---

[39] *Joint Motion to Reopen* at 2.

[40] *Ute IV*, 935 F. Supp. at 1531 (internal quotation marks omitted).

[41] *Tribe Br.* at 1 n.2.

[42] *Joint Motion to Reopen* at 2; *see also State Br.* at 5; *Tribe Br.* at 6.

## I.    The Law of the Case Doctrine and Mandate Rule Apply.

Both parties assert the law of the case doctrine applies.[43]  The court agrees.  "The law of
the case doctrine posits that 'when a court decides upon a rule of law, that decision should
continue to govern the same issues in subsequent stages in the same case.'"[44]  "Among the law
of the case rules is the obligation of every court to honor the rulings of a court that stands higher
in the hierarchical judicial structure."[45]  "The doctrine of law of the case comes into play only
with respect to issues previously determined."[46]  "[W]hen an issue is once litigated and decided,
that should be the end of the matter."[47]  An "important corollary of the" law of the case doctrine
is the mandate rule, which "provides that a district court 'must comply strictly with the mandate
rendered by the reviewing court.'"[48]  When the Tenth Circuit decides an issue, this court is bound
by that determination.[49]

The Tenth Circuit clearly declared that *Ute III* and *Ute V* decided "all boundary
questions" as to the Uintah Reservation.[50]  The split estate issue presents another Uintah

---

[43] *See Tribe Br.* at 5–11 (arguing the mandate rule applies because split estate land is "unequivocally Indian Country under the Holdings in *Ute I* and the en banc mandate of *Ute III*, and that precedent was not modified by *Ute V*"); *State Br.* at 5–10 ("Under *Hagen* and *Ute V* rulings, as well as the law of the case doctrine, lands patented to non-Indians are not Indian Country.").

[44] *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1553 (10th Cir. 1991) (citation modified) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)); *see also Dobbs v. Anthem Blue Cross & Blue Shield*, 600 F.3d 1275, 1279 (10th Cir. 2010).

[45] *Mason*, 948 F.2d at 1553 (citing 18 *Wright & Miller's Federal Practice & Procedure* § 4478).

[46] *Quern v. Jordan*, 440 U.S. 332, 347 n.18 (1979) (citing *In re Sanford Fork & Tool Co.*, 160 U.S. 247 (1895)).

[47] *United States v. U.S. Smelting Ref. & Mining Co.*, 339 U.S. 186, 198 (1950) (citations omitted); *see also Dobbs*, 600 F.3d at 1280 (The law of the case "doctrine is based on sound public policy that litigation should come to an end and is designed to bring about a quick resolution of disputes by preventing continued re-argument of issues already decided and to discourage forum-shopping by litigants." (internal quotation and citation omitted)).

[48] *Ute V*, 114 F.3d at 1520–21 (quoting *Colo. Interstate Gas Co. v. Nat. Gas Pipeline Co. of Am.*, 962 F.2d 1528, 1534 (10th Cir. 1992)); *see also Mason*, 948 F.2d at 1553 ("Under the 'law of the case' doctrine, the district court may not deviate from the appellate court's mandate.").

[49] *Dobbs*, 600 F.3d at 1279 (citing *Homans v. City of Albuquerque*, 366 F.3d 900, 904 (10th Cir. 2004)).

[50] *Ute V*, 114 F.3d at 1521; *Ute VII*, 835 F.3d at 1264.

8

Reservation boundary question.  Strict compliance with the Tenth Circuit's mandates in *Ute V*

and *Ute VII* compels this court to find the law of the case doctrine applies.  This court must not

relitigate the boundary issue but rather is tasked with interpreting the Circuit's prior *Ute*

decisions to resolve the split estate issue.[51]

**II.**      **Under *Ute V*, the Surface of Split Estate Land Is Not Indian Country.**

Under the plain language of *Ute V*, the surface of split estate land, by definition, is not

Indian Country.  *Ute V* held Indian Country does not include Uintah Reservation lands that "were

unallotted, opened for resettlement under the 1902–05 legislation, and not thereafter returned to

tribal ownership."[52]  The parties rely on this language to define split estate land as lands that "(i)

were 'unallotted;' (ii) were 'opened to non-Indian settlement under the 1902–05 legislation,' and

(iii) were not thereafter returned to tribal ownership.'"[53]  Since *Ute V* delineates this land as non-

Indian Country, and the parties define the surface split estate land as possessing all three features,

the surface of the split estate land by definition is not Indian Country under *Ute V*.

The Tribe argues tribal ownership of the subsurface estate interest is sufficient to confer

jurisdiction over the surface.[54]  The court is unpersuaded.  The surface estate interest must be the

interest that determines jurisdiction of the surface.  One of the three features that renders the land

non-Indian Country is that the land was "opened for *resettlement* under the 1902–05

legislation."[55]  Resettlement is defined as "the act or process of helping people move to another

---

[51] Accordingly, the court will not consider the parties' other precedential, regulatory, or policy arguments.  *See Tribe Br.* at 12–20; *State Br.* at 10–13.

[52] *Ute V*, 114 F.3d at 1528.

[53] *Joint Motion to Reopen* at 2 n.1 (citing *Ute V*, 114 F.3d at 1528).

[54] *See Tribe Reply* at 5–6.  The parties agree the "subsurface interest retained in trust are Indian Country."  *See State Sur-Reply* at 4 n.3.

[55] *Ute V*, 114 F.3d at 1528 (emphasis added); *see also Joint Motion to Reopen* at 2 n.1.

place to live."[56]  People resettle, or live, on the surface estate—regardless of the ownership of the subsurface.  The surface, not the subsurface, must then be the interest that controls under *Ute V*.

The Tribe's argument would require the court to create an exception to *Ute V* that the Circuit did not contemplate.  *Ute V* does not distinguish between surface and subsurface estates.[57]  Under its plain language, non-Indian Country and split estate land are the same— namely land that was unallotted, opened for resettlement, and not thereafter returned to tribal ownership.  Further, no decision post-*Hagen* has suggested any surface-subsurface distinction is significant.  The purpose of *Ute V* was to modify *Ute III* only to the extent that it directly conflicted with *Hagen*.[58]  *Hagen* made no distinction between surface and subsurface estates.[59] *Ute VII* provides a robust summary of the *Ute* cases and *Hagen* and also makes no surface-subsurface estate distinction.[60]  Especially in light of the Tenth Circuit's pronouncement that "all boundary questions at issue [have] been finally resolved,"[61] the absence of any discussion concerning surface and subsurface estates makes clear that this distinction is not relevant under these cases.  Instead, the status of the surface estate determines jurisdiction of the surface.

Nonetheless, the Tribe asks this court to read into *Ute V* a distinction based on the subsurface interest.  Doing so where no post-*Hagen* case has would run afoul of *Ute V*'s plain

---

[56] *Resettlement*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/resettlement (last visited Mar. 3, 2026); *see also Resettlement*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/resettlement [https://perma.cc/4W3N-NRYP] (last visited Mar. 3, 2026) ("to settle (someone or something) again or anew especially: to move (people) to a new place to *live*" (emphasis added)).

[57] *See Ute V*, 114 F.3d at 1528–31.

[58] *Id.* at 1527.

[59] *See Hagan*, 511 U.S. at 410–22.

[60] *See Ute VII*, 835 F.3d at 1258–60.

[61] *Id.* at 1264 (citation modified) (quoting *Ute V*, 114 F.3d at 1521).

language—and violate the mandate rule for failing to strictly comply with the Circuit's instructions.[62]  The court will not here for the first time create such an exception.

### III.  The Tribe's Argument Fails Because *Ute I* Did Not Specifically Hold Split Estate Land Is Indian Country.

The Tribe's strongest counterargument is the following: *Ute V* is silent as to the specific issue of split estate land; where *Ute V* is silent, *Ute III* controls; *Ute III* affirmed the relevant holdings in *Ute I*; and *Ute I* specifically held split estate land is Indian Country.[63]  While this argument sounds persuasive at first blush, it ultimately fails because *Ute I* did not independently hold that split estate land is Indian Country.  The court reaches this conclusion based on three features of the *Ute I* decision: (1) the general *Ute I* holdings encompassed the split estate land, (2) the structure of the opinion, and (3) the plain language of the court's split estate land discussion.  The court addresses each feature in turn.

*A.  The General Holdings of* Ute I

*Ute I* included a summary and conclusions section that clearly identified its holdings.[64]  The court declared it reached four conclusions:

> (1) That the original boundaries of the Uncompahgre Reservation as established by Executive Order in 1882 have been disestablished by Congress and no longer exist, Act of June 7, 1897, 30 Stat. 62, 87;
> (2) That the original boundaries of the Uintah Valley Indian Reservation have been diminished by Congress through the withdrawal of the Gilsonite Strip in 1888 by agreement with the Utes, through the withdrawal of 1,010,000 acres of timber land and their inclusion in the contiguous national forest reservations pursuant to the Act of Mar. 3, 1905, 33 Stat. 1048, and through the withdrawal of nearly 56,000 acres of land for the Strawberry reclamation project by the Act of April 4, 1910, 36 Stat. 269, 285;

---

[62] *See Ute V*, 114 F.3d at 1520–21; *Colo. Interstate Gas Co.*, 962 F.2d at 1534.

[63] *See Tribe Br.* at 5–11.

[64] *Ute I*, 521 F. Supp. at 1152–57.

> (3) Save as thus expressly diminished, the lands of the Uintah Valley Indian Reservation retain continuing status as lands within the boundaries of an Indian reservation, and are "Indian Country" as a matter of federal law, see 18 U.S.C. § 1151(a) (1976); and (4) That the reservation boundaries of the former Uintah Valley Reservation, now the Uintah and Ouray Indian Reservation, have been extended by Congress to include the lands known as the Hill Creek Extension pursuant to the Act of Mar. 11, 1948, 62 Stat. 72.[65]

None of these conclusions reference split estate land. Further, split estate land is not mentioned in the entirety of the summary and conclusions section.[66] If the court intended to independently hold split estate land is Indian Country, the court would have included such a holding here. It did not.

The court did not need to reach a specific holding with respect to split estate land because this land was fully encompassed by the third enumerated conclusion.[67] The *Ute I* court was tasked with identifying the boundaries of the Uintah Valley Reservation, which required determining whether the 1902–05 legislation disestablished, diminished, or preserved the original boundary.[68] The court ultimately concluded the 1905 legislation did not diminish the Uintah Reservation so all land within the original outer boundary is Indian Country.[69] Split estate land is within the outer boundary of the Reservation and thus encompassed within this holding.[70] The court did not need to, and did not, specifically hold split estate land is Indian Country.

---

[65] *Id.* at 1153–54.

[66] *See id.* at 1152–57.

[67] *Id.* at 1154 (holding "the lands of the Uintah Valley Indian Reservation retain continuing status as lands within the boundaries of an Indian reservation, and are 'Indian Country' as a matter of federal law").

[68] *Id.* at 1075, 1153–54.

[69] *Id.* at 1153–54.

[70] The 1902–05 legislation applied only to Uintah Reservation land. *Id.* at 1115, 1121. By definition, split estate land was unallotted and opened for resettlement under this legislation. Therefore, this land must be within the original outer boundary of the Uintah Reservation.

*B. The Structure of* Ute I

The structure of *Ute I* further establishes the court did not specifically hold split estate land is Indian Country. Under the Supreme Court's test at the time, a reservation is not disestablished unless a "congressional determination to terminate (an Indian reservation)" is "expressed on the face of the Act or" is "clear from the surrounding circumstances and legislative history."[71] The *Ute I* court considered a "ladder of priorities" to determine whether Congress intended to disestablish the Uintah Reservation under the 1902–05 legislation: (1) statutory language, (2) legislative history, and (3) contemporaneous Executive Branch interpretations, subsequent congressional and executive interpretations, and other surrounding circumstances.[72] The *Ute I* opinion addresses each priority in turn.

As the first priority on the ladder, the express statutory language was the most important consideration and analyzed first.[73] The court compared the language of the different statutes.[74] The 1902 legislation allotted 40 or 80 acres to each tribal member, provided the Tribe consented, and stated unallotted land "shall be restored to the public domain."[75] After the Tribe did not consent, Congress passed the 1905 legislation, which incorporated much of the 1902 legislation but removed the public domain language and instead provided unallotted lands "shall be disposed of under" the homestead and townsite laws.[76] The *Ute I* court concluded the language of the 1902 legislation would have diminished the reservation but was superseded by the 1905

---

[71] *Id.* at 1127 (quoting *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 583, 586 (1977)); *see also id.* at 1092 (explaining the standard requires "the record provide[] the hard evidence necessary to overcome the general presumption against an intent to disestablish a reservation" (citation modified)).

[72] *Id.* at 1092.

[73] *Id.* at 1092–127.

[74] *Id.* at 1111–27.

[75] *Id.* at 1114–15.

[76] *Id.* at 1118, 1121. The statute exempted tracts that were set aside as national forest reserve and mineral from this provision. *Id.* at 1121.

legislation, which opened the Reservation to non-Indian settlers but did not disestablish it.[77]

Relying on the change of language between the 1902 legislation and 1905 legislation, the court found there was no clear intent on the face of the 1905 Act to terminate the reservation.[78]

The court then considered the remaining priorities—legislative history, contemporaneous interpretations, and subsequent interpretations.[79] All of these confirmed there was no clear congressional intent to terminate the reservation.[80] The final priority included considering evidence that the Executive Branch treated the Uintah lands as a reservation after 1905.[81] The entire discussion of split estate land is encompassed in this section, in the context of the Secretary of the Interior's 1945 Restoration Order returning lands that had not been fee-patented to non-Indians to tribal ownership.[82] The court interpreted the Secretary *returning* land to the Reservation to mean the Executive Branch treated the Reservation as still existing.[83] Based on all the priorities, the court concluded the Reservation was not diminished.[84]

---

[77] *Id.* at 1122–24.

[78] *Id.* at 1127 (stating "congressional determination to terminate (an Indian reservation) must be expressed on the fact of the Act or be clear from the surrounding circumstances and legislative history" and "[s]uch intent was not expressed on the fact of the 1905 Act").

[79] *Id.* at 1127–50.

[80] *Id.* at 1127–41 (considering legislative history); *id.* at 1142–50 (considering surrounding circumstances and subsequent interpretations by the Executive Branch).

[81] *Id.* at 1142.

[82] *Id.* at 1142–44.

[83] *Id.* at 1144 ("A number of other parcels of land within the reservation were restored to trust status by subsequent orders. The conclusion that the lands restored to tribal ownership were within the existing boundaries of an Indian reservation is buttressed by a formal opinion by the Solicitor of the Department of the Interior construing the scope of the 1945 [Restoration] Order." (internal citations omitted)).

[84] *Id.* at 1150. *Ute I* did find the original boundary was diminished by the withdrawal of national forest and Strawberry Reservoir Project lands. *Id.* This holding was reversed in *Ute III*, which held the withdrawal of the national forest lands did not diminish the Reservation. *Ute III*, 773 F.3d at 1093. The national forest lands and Strawberry Project lands are not relevant to the split estate issue.

14

The split estate land discussion was not a separate holding, but rather one consideration that reinforced the court's overall conclusion that the 1905 legislation did not diminish the Reservation. This general holding was supported by all the priorities, including the evidence that the Executive Branch treated the mineral estate as returning to the Reservation in the 1940s. This priority was not an independent holding, however. Indeed, none of the priorities were independent holdings. Instead, the holding was just as the court summarized in its summary and conclusion section: "the lands of the Uintah Valley Indian Reservation retain continuing status as lands within the boundaries of an Indian reservation, and are 'Indian Country' as a matter of federal law."[85]

### C. The Discussion of Split Estate Land in Ute I

A close examination of the split estate discussion further demonstrates the court did not specifically hold split estate land is Indian Country. Split estate land is discussed only in the context of the 1945 Restoration Order.[86] To determine whether the Secretary was creating a reservation or returning land to an existing reservation, the court examined a letter written by the Solicitor of the Department of Interior in 1947.[87] The Solicitor concluded the 1945 Restoration Order restored to tribal ownership the mineral estates underlying fee-patented lands as well as the whole of the unallotted and unappropriated lands:

> The order restores all lands. . . . The minerals in place are a part of the land. The fact that a lesser estate, the surface, has been carved out of the land and disposed of does not make that which is left, the mineral estate, any the less "lands." . . . [I]t is my opinion that the mineral underlying the patented lands within the Uintah and

---

[85] *Ute I*, 521 F. Supp. at 1154.

[86] *Id.* at 1143–44.

[87] *Id.* at 1144.

> Ouray Indian Reservation were restored to tribal ownership by the [1945 Restoration O]rder.[88]

During oral argument, counsel for the Tribe pointed to this last sentence to say *Ute I* held split estate land is Indian Country. But this language is a quote from the Solicitor's letter.[89] It is not the *Ute I* court's opinion that the minerals were restored to tribal ownership but rather the Secretary's. The court was merely relying on this letter to support its conclusion that the Department of Interior action showed the Executive Branch treated the land as if it was still a reservation—and thus not disestablished by the 1902–05 legislation.[90] The court did not independently hold the land discussed by the Secretary is Indian Country.

The opinion's general holding, structure, and discussion o f split estate land all lead this court to conclude *Ute I* did not make a specific holding with respect to split estate land. Thus, there was no such holding for *Ute III* to affirm. *Ute V* must govern the split estate issue, and under that mandate, split estate land is not Indian Country.

### CONCLUSION

For the reasons explained, the court grants the State declaratory relief: split estate land is not Indian Country.[91]

---

[88] *Id.* (quoting II Opinions of the Solicitor of the Department of Interior Relating to Indian Affairs, 1917–1947, at 1434, 1435–36 (1979)).

[89] *Id.*

[90] *Id.* at 1142 ("More significant, however, is executive departmental action taken in regards to the Uintah lands because of their apparent reservation status.").

[91] Dkt. 1326 is GRANTED. Dkt. 1317 is DENIED.

SO ORDERED this 23rd day of March, 2026.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge